**UNITED STATES of America,**

v.

**John WALSH, Defendant.**

**No. 96–CR–1C(Sc).**

United States District Court,
W.D. New York.

July 14, 1998.

188

Denise E. O'Donnell, United States Attorney (Paul J. Campana, Assistant United States Attorney, of counsel), Buffalo, NY, for U.S.

Connors & Vilardo (Terrence M. Connors, of counsel), Buffalo, NY, for Defendant.

CURTIN, District Judge.

Before the court is defendant John Walsh's motion for judgment of acquittal or, in the alternative, motion to dismiss the second superseding indictment, or motion to grant a new trial (Item 58). The government has responded (Item 61), and defendant has replied (Item 62). The parties appeared before the court for oral argument on December 4, 1997.

## BACKGROUND

After a trial by jury, defendant John Walsh was convicted on all three counts of violating 18 U.S.C. § 242. Each count charged that defendant Walsh deprived inmate Norvin Fowlks of his constitutional rights by stepping on Fowlks' penis while Fowlks was in a cell at the Orleans County Jail.

Walsh was a Lieutenant at the jail and supervised the other Corrections Officers on his shift. Of particular note, he weighed almost 400 pounds. Fowlks was an inmate at the jail when the alleged incidents occurred. Although Fowlks is mentally ill and currently housed at a mental hospital, he was able to testify at the trial.

The trial took place from September 22, 1997, through September 30, 1997. The jury found Walsh guilty on all counts. The following is a recount of the evidence "read most favorably to the jury's verdict." *United States v. Lanier*, 520 U.S. 259, ——, 117 S.Ct. 1219, 1222, 137 L.Ed.2d 432 (1997).

### I. *Count One*

Count One charged that Walsh stepped on Fowlks' penis sometime between January 4, 1991 and March 8, 1991. The government presented evidence that Fowlks was an inmate at the jail from January 1, 1991, through January 11, 1991, that he was released on January 11, 1991, but then was arrested again the same day and readmitted to the jail (Item 61, Exh. A). Fowlks was released on January 12, 1991, but then reentered the jail again on January 18, 1991, and remained there continuously until February 19, 1991 (*Id*).

Fowlks and former Orleans County Corrections Officer Joseph Kujawa testified as to the offense charged in Count One. Kujawa was a corrections officer at the jail from 1988 until he resigned on March 8, 1991, to join the Village of Medina Police Force. He said that he saw Walsh step on Fowlks' penis as Fowlks was locked in a holding cell on the ground floor of the jail.

Although Kujawa could not recall the exact date of this incident, he stated that it oc-

curred sometime after the Christmas–New Year's holiday break, but before he resigned on March 8, 1991. During this time period, he explained that he was attending classes at a police academy which met on Tuesday and Thursday evenings from 5 p.m. to 10 p.m. and on Saturdays from 9 a.m. to 5 p.m. He testified that the event did not occur on a night when he attended classes. Kujawa reviewed the day sheets used by corrections officers to sign in and sign out. He noted that the beginning of his night shift and the end of the defendant's afternoon shift overlapped on non-school days seven different times from January 4, 1991, to February 19, 1991, on days when Mr. Fowlks was in jail.

Kujawa testified that one night between January 4, 1991, and March 8, 1991, he reported to work shortly after 11 p.m. He went to the kitchen on the second floor of the jail and chatted with other officers there. One of them was Walsh. Shortly before 11:30 p.m., Kujawa and Walsh left the kitchen and went to the ground floor booking area two floors below. The booking area has a small corridor with four holding cells that measure about four feet by six feet, and a booking room across the corridor from the cells. Walsh turned left down this corridor, a step or two ahead of Kujawa. The holding cells were to their right. Fowlks was in the cell at the far end of the corridor. This cell was different from others because it had no toilet or sink. Fowlks was kept in that cell often for making excessive noise, disturbing other prisoners, breaking things, or other misconduct.

Kujawa heard Fowlks shout repeatedly, "Big Jack, give me a cigarette." The defendant walked to the front of Fowlks' cell and said, "OK, Norvin, you know the routine, put your dick on the bars." Fowlks, naked inside the cell, placed his penis on a horizontal steel plate of the door to his cell. Walsh then grabbed two of the vertical cell bars with his hands, raised his right foot and placed it on Fowlks' penis while rising on the toes of his left foot as if he were climbing a ladder. Kujawa stated that Fowlks' eyes bulged and that he screamed in a voice louder than the screams that Kujawa had heard at the scenes of serious accidents. The inci-

dent took only a few seconds. Walsh then gave Fowlks a cigarette.

Kujawa testified that he did not report the incident initially because he knew that he was going to be taking a new job in only a few months as a police officer in Medina and did not want to cause any problems before he left.

## II. *Count Two*

Count Two charged that Walsh stepped on Fowlks' penis sometime between May 26, 1992, and December 1, 1992. The government presented evidence that Fowlks was an inmate of the jail from May 26, 1992, through January 20, 1993 (Item 61, Exh. B). In addition to Fowlks' testimony, Corrections Officer Paul Sidari and former Corrections Officer Timothy Bourke testified as to Count Two.

Sidari testified that he saw the incident from a position just inside the door to the booking room across from the row of holding cells. The booking room entrance looks out to the narrow corridor lined by the four holding cells. Outside the door and to the left was the cell occupied by Fowlks. Sidari heard Fowlks ask Walsh for a cigarette. Walsh was holding a cigarette and slapped the clenched fist of one hand into the open palm of the other and said to Fowlks, "Who am I? Who am I?" Fowlks replied "Hammer Jack." Walsh then said, "If you want a cigarette, you have to put your dick on the bars."

Fowlks, in a standing position, placed his penis on a horizontal steel plate at a height about 27 inches above the floor. Walsh then grabbed two vertical cell bars with his hands, raised his right foot and placed it on Fowlks' penis, while rising on the toes of his left foot. Walsh rocked up and down while his right foot was on Fowlks' penis. Fowlks screamed in pain and held his genitals. Walsh then flipped a cigarette into the cell which Fowlks retrieved and smoked.

Sidari said that this occurred in 1992, but before his assignment to a different shift on December 1, 1992. By reviewing the sign-in sheets he was able to identify twenty-two days between May 26, 1992, and December 1,

1992, when he, Bourke, and Walsh were on duty at the same time.

Former Corrections Officer Bourke testified that he saw the incident from a position in the corridor outside the booking room to the right of the booking room door frame. He recalled that there was someone who had dark hair and was shorter than he was who was also present in the corridor standing to Bourke's right. In a pre-indictment interview with the FBI, Bourke testified that this person was Corrections Officer Francis Woodward. However, at trial, Woodward testified for the defendant that he did not observe the incident described by Sidari and Bourke.

Bourke also reviewed the sign-in sheets and identified twenty-two days between May 26, 1992, and December 1, 1992, when he, Sidari, and Walsh were on duty at the same time. In addition, both Sidari and Bourke testified that there were three days when Sidari, Bourke, Woodward and Walsh were on duty at the same time.

### III. *Count Three*

Count Three charged that Walsh stepped on Fowlks' penis sometime between May 26, 1992, and July 22, 1992. The government presented evidence that Fowlks was an inmate of the jail from May 26, 1992, through January 20, 1993 (Item 61, Exh. B).

Dwayne Holloman, who was an inmate at the Jail from February 18, 1992, through July 22, 1992, testified that he witnessed the offense charged in Count Three. Holloman said that one day when he was downstairs in the booking area sweeping the stairs, he saw Fowlks in one of the holding cells that had a sink-toilet fixture, as opposed to the first cell which did not. He was standing in the booking room across the hall from the cell when he saw Walsh in the cell with Fowlks. While Fowlks was lying on his back on the floor, Walsh stood over him and stepped on Fowlks' penis, mashing it as one might extinguish a cigarette with one's foot. Holloman heard Fowlks curse at Walsh in a loud voice as Walsh was stepping on Fowlks' penis.

A few days after the incident, Holloman talked with Fowlks and asked him if he was hurt. Holloman said that Fowlks told him that it didn't hurt "too much," but at trial Fowlks said it did hurt.

Also, while Holloman could not recall an exact date when the incident occurred, he said that at the time Fowlks had a bandage or cast on his hand when Walsh stepped on his penis. Fowlks went to the Erie County Medical Center on June 5, 1992, to have staples removed from a stab wound that he suffered to his hand four weeks before.

### IV. *Post Trial Motions*

In support of his motions, defendant essentially has three arguments: (1) the government failed to prove the charges beyond a reasonable doubt because the evidence was insufficient to sustain a conviction; (2) the second superseding indictment failed to give the defendant adequate notice and time to prepare for trial; and (3) the prosecutor made improper arguments during the summations.

### DISCUSSION

#### I. *The Evidence was Sufficient to Sustain a Conviction*

##### A. Legal Standard for Motion for Judgment of Acquittal

■ "A defendant challenging the legal sufficiency of trial evidence bears a 'heavy burden.'" *United States v. Coiro*, 922 F.2d 1008, 1016 (2d Cir.), *cert. denied*, 501 U.S. 1217, 111 S.Ct. 2826, 115 L.Ed.2d 996 (1991) (citing *United States v. Roman*, 870 F.2d 65, 71 (2d Cir.), *cert. denied*, 490 U.S. 1109, 109 S.Ct. 3164, 104 L.Ed.2d 1026 (1989)). The court " 'must credit every inference that could have been drawn in the government's favor.'" *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir.1993) (citations omitted). Viewed in this light, the court must uphold the jury's verdict if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *see also United States v. Badalamenti*, 794 F.2d 821, 828 (2d Cir.1986).

■ In considering whether to overturn a jury verdict, the court must give " 'full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact.' " *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir.1984) (quoting *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir.1972)). Furthermore, "a conviction may be based upon circumstantial evidence and inferences based upon the evidence." *Strauss*, 999 F.2d at 696 (citing *Mariani*, 725 F.2d at 865).

**B. 18 U.S.C. § 242**

■ Defendant was convicted under, 18 U.S.C. § 242, "Deprivation of rights under color of law," which provides:

> Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States ... shall be fined under this title or imprisoned ..., or both.

18 U.S.C. § 242. As the Supreme Court recently explained in *United States v. Lanier*, 520 U.S. 259, ——, 117 S.Ct. 1219, 1224, 137 L.Ed.2d 432 (1997):

> Section 242 is a Reconstruction Era civil rights statute making it criminal to act (1) "willfully" and (2) under color of law (3) to deprive a person of rights protected by the Constitution or laws of the United States.

*Id.* (citing 18 U.S.C. § 242; *Screws v. United States*, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945)). This statute is the criminal counterpart to 42 U.S.C. § 1983, "Civil Action for Deprivation of Rights." *United States v. Price*, 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966). What distinguishes 18 U.S.C. § 242 actions from 42 U.S.C. § 1983 actions is the state of mind requirement—a defendant must act "willfully" in order to violate this statute. *See Monroe v. Pape*, 365 U.S. 167, 187, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

■ The seminal case in which the Supreme Court addressed the intent required

by 18 U.S.C. § 242 was *Screws v. United States*, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945).[1] In *Screws*, the Supreme Court stated that willfulness requires "an intent to deprive a person of a right which has been made specific either by the express terms of the Constitution or laws of the United States or by decisions interpreting them." *Id.* at 104, 65 S.Ct. 1031. Willfulness can be shown by circumstantial evidence, *Screws*, 325 U.S. at 107, 65 S.Ct. 1031, and "an individual can intend to violate a right even if the individual is not thinking in terms of any right—by recognizing that willfulness includes reckless disregard." *United States v. Johnstone*, 107 F.3d 200, 208 (3d Cir.1997) (citing *Screws*, 325 U.S. at 105, 65 S.Ct. 1031). Thus, "it is enough to trigger § 242 liability if it can be proved—by circumstantial evidence or otherwise—that a defendant exhibited reckless disregard for a constitutional or federal right." *Johnstone*, 107 F.3d at 208–09.

**C. Excessive Force under the Eighth Amendment**

■ It is well established that the Eighth Amendment protects prisoners from "cruel and unusual punishment" and that "inmates have the right to be free from the 'unnecessary and wanton infliction of pain' at the hands of prison officials." *See, e.g., Estelle v. Gamble*, 429 U.S. 97, 102–105, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Wilson v. Seiter*, 501 U.S. 294, 296–97, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). Defendant correctly argues that the Eighth Amendment's prohibition of "cruel and unusual" punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force. However, defendant neglects to mention that the Supreme Court qualified this statement by explaining: "provided that the use of force is not of a sort 'repugnant to the conscience of mankind.' " *Hudson v. McMillian*, 503 U.S. 1, 10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (citations omitted).

■ To determine whether excessive force was used, the Supreme Court discerned that there are two elements necessary to sustain a constitutional violation: (1) an objective

---

**1.** *Screws* was decided under 18 U.S.C. § 52, the     predecessor statute to 18 U.S.C. § 242.

element and (2) a subjective one. *Hudson,* 503 U.S. at 8, 112 S.Ct. 995; *see also Romano,* 998 F.2d at 105.

### 1. Objective Element

■ Objectively, it must be established "that the deprivation alleged is sufficiently serious or 'harmful enough' to reach constitutional dimensions." *Id.* "While a *de minimis* use of force will rarely suffice to state a constitutional claim, the plaintiff is not required to show that the application of force resulted in serious injury." *Brown v. Busch,* 954 F.Supp. 588, 594 (W.D.N.Y.1997) (citing *Hudson,* 503 U.S. at 9, 112 S.Ct. 995).

Here, defendant argues that Fowlks' constitutional rights were not violated because defendant's stepping on Fowlks' penis was merely the application of *de minimis* force under *Brown v. Busch,* 954 F.Supp. 588 (W.D.N.Y.1997) and was at most a spontaneous act under *Johnson v. Glick,* 481 F.2d 1028 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).

■ While defendant cites numerous cases listed in *Brown* that constitute *de minimis* force, the bodily injury suffered by Fowlks in this case is distinguishable and of the sort that is "repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9, 112 S.Ct. 995. Objectively, a constitutional deprivation occurred when the defendant stepped on Fowlks' penis. Stepping on one's penis is not "routine discomfort [that] is 'part of the penalty that criminal offenders pay for their offenses against society.'" *Hudson,* 503 U.S. at 9, 112 S.Ct. 995 (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)).

Furthermore, defendant's conduct was not a spontaneous act under *Johnson v. Glick,* 481 F.2d 1028 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). From the evidence, these acts were not spontaneous, but rather were routine and deliberate. Walsh stepped on Fowlks' penis three different times. Walsh's conduct was not necessary "to maintain or restore discipline," *Hudson,* 503 U.S. at 6, 112 S.Ct. 995, but rather constituted a constitutional deprivation.

### 2. Subjective Element

■ Subjectively, it must be shown that the defendant acted "maliciously and sadistically to cause harm." *Hudson,* 503 U.S. at 7, 112 S.Ct. 995. That is, the court must determine "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* In making this determination,

a jury should consider the following factors: the extent of the plaintiff's injuries; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response.

*Romano,* 998 F.2d at 105.

■ Here, defendant's conduct was wanton and malicious because there was no need for the application of force used, there was no threat reasonably perceived by the defendant given that Fowlks was in his cell, and the defendant made no effort to temper the severity of a forceful response. *See Hudson,* 503 U.S. at 7–8, 112 S.Ct. 995. In sum, defendant's conduct violated Fowlks' "right to be free from the 'unnecessary and wanton infliction of pain' at the hands of prison officials." *Romano,* 998 F.2d at 104 (citations omitted).

Since both the objective and subjective elements articulated in *Hudson* and *Romano* have been met, an Eighth Amendment violation occurred.

### D. A Serious Injury is not required for an Eighth Amendment Violation

While defendant argues that Fowlks did not suffer a serious injury medically, the Supreme Court held in *Hudson* that "the use of excessive physical force against a prisoner may constitute cruel and unusual punishment when the inmate does not suffer serious injury." *Hudson,* 503 U.S. at 4, 112 S.Ct. 995. In so holding, the Supreme Court explained that "the Eighth Amendment's prohibition of cruel and unusual punishments 'draw[s] its meaning from the evolving standards of de-

cency that mark the progress of a maturing society.'" *Id.* at 8, 112 S.Ct. 995 (quoting *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) (citations omitted)). "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Id.* at 9, 112 S.Ct. 995 (quoting *Whitley v. Albers,* 475 U.S. 312, 327, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)). The Court went on to further state that "[t]his is true whether or not significant injury is evident." *Id.* at 9, 112 S.Ct. 995.

Accordingly, under *Hudson,* defendant's argument that Fowlks did not suffer a serious injury has no merit.

### E. Jury Charge

Fowlks was sometimes in the jail as an inmate and other times as a detainee during the time periods charged. In *Bryant v. Maffucci,* 923 F.2d 979, 983 (2d Cir.1991), the Second Circuit noted that:

> It remains unsettled, in other words, whether a pretrial detainee must meet the 'deliberate indifference' standard of *Estelle* or show 'gross negligence' or 'recklessness' or prove conduct not amounting to intentional acts, but that is more than simple negligence to state a claim of a constitutional deprivation under the Due Process Clause.

Accordingly, the court instructed the jury on Eighth Amendment violations under the more stringent standard. The court informed the parties of this instruction before charging the jury, and neither objected.

### F. Summary

Based on the foregoing, parts I.A–I.E, defendant's motion for judgment of acquittal is denied.

### II. *The Second Superseding Indictment gave the Defendant Adequate Notice*

The original indictment (Item 1) was returned on January 4, 1996, and the defendant was arraigned on January 11, 1996. On May 2, 1996, the Grand Jury returned the first superseding indictment (Item 15), which added Counts Two and Three. Arraignment followed on May 15, 1996. Then, on August 12, 1997, the government notified the defendant and the court that it intended to seek a second superseding indictment which would make a slight change in the wording of Count One (Item 64). Specifically, the wording was changed from "thereby depriving Norvin Fowlks of the right secured to him by the Constitution and laws of the United States not to be subjected to cruel and unusual punishment, that is, the unnecessary and wanton infliction of pain" to "thereby depriving Norvin Fowlks of a right secured to him by the Constitution and laws of the United States" (Item 64).

The reason for the change in wording was to avoid confusion over any changes in the custodial status of Fowlks while at the jail from a person serving a sentence to a person incarcerated as a pretrial detainee during the time period charged in Count One. *Cf.* Part I.E., *supra.* At the end of the letter, the government suggested that since there were no new facts or no new charges, then the defendant could be arraigned before jury selection on September 10, 1997 (Item 64).

The second superseding indictment, with this change in wording, was filed on August 21, 1997 (Item 45). In response to defense objections, the court adjourned the trial until September 22, 1997, so that defense counsel would have more time to prepare (Item 46). The court noted in its Order that the second superseding indictment did not have any additional facts for the defendant to address, but rather only changed the wording in Count One (*Id.*). At that time, the defendant did not object to the government's suggestion that a convenient time to arraign the defendant would be the day chosen for jury selection. The defendant was then arraigned on the second superseding indictment after the jury was selected and sworn.

In its post-trial motion, defendant argues that the second superseding indictment failed to give him sufficient notice and that it contained too vague of a time period for the crimes charged. However, the Supreme Court held in *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974) that:

an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or a conviction in bar of future prosecutions for the same offense.

Furthermore, the Second Circuit has " 'consistently sustained indictments which tracked the language of the statute and, in addition, do little more than state time and place in approximate terms.' " *United States v. Bernstein,* 533 F.2d 775, 786 (2d Cir.) *cert. denied,* 429 U.S. 998, 97 S.Ct. 523, 50 L.Ed.2d 608 (1976) (citing *United States v. Salazar,* 485 F.2d 1272, 1277, (2d Cir.1973), *cert. denied,* 415 U.S. 985, 94 S.Ct. 1579, 39 L.Ed.2d 882 (1974)).

▉ Here, the second superseding indictment gave the defendant adequate notice of the crimes charged because it changed only the wording of one sentence in Count One. Thus, defendant had adequate notice of the three counts that he was charged with over one year before the trial and was not prejudiced because no new counts were alleged. Furthermore, all three indictments contained the elements of the offense charged and enabled defendant to plead knowledgeably. The defendant does not explain how he was prejudiced by the fact that he was not arraigned until after the jury was sworn.

Finally, the cases cited by defendant are distinguishable and, in fact, support the government. In *Gundlach v. United States,* 262 F.2d 72 (4th Cir.1958), *cert. denied,* 360 U.S. 904, 79 S.Ct. 1283, 3 L.Ed.2d 1255 (1959), the Fourth Circuit upheld a conviction even though an arraignment was scheduled, but never held. In *Anderson v. United States,* 352 F.2d 945 (D.C.Cir.1965), the district court upheld a conviction even though counsel was not present when the defendant entered a not-guilty plea. In *Hamilton v. Alabama,* 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961), the Supreme Court overturned the conviction because the defendant appeared at his arraignment in a capital case without an attorney. In *United States v. Olivera,* 764 F.Supp. 629 (S.D.Fla.1991), the district court overturned the conviction because the two defendants were never arraigned on the superseding indictment and were convicted *in absentia.*

Based on the foregoing, defendant Walsh's motion to dismiss the second superseding indictment is denied.

### III. *The Statements of the Prosecutor did not deny Defendant a Fair Trial*

At trial, after the government's rebuttal to the defendant's closing statement, defendant's counsel made a motion for a mistrial because he said that the prosecutor improperly vouched for the credibility of his witnesses and expressed his personal opinion. (Tr. I at 73). The court denied this motion stating that while the prosecutor's statements "were on the borderline," the court also told the jury immediately at the end of the prosecutor's rebuttal that:

> keep in mind that what either Mr. Campana [prosecutor] says or Mr. Connors [defendant's counsel] says is not evidence, and in [sic] most importantly, that I think that when Mr. Campana spoke to you, it appeared that he had some opinion. Well, he can't, he can't testify in the case, but, so that anything he said you must find based upon the evidence, based upon the facts or the exhibits in the case. And it's up to you to draw the conclusions of what all this means from the testimony.

Tr. I at 72–73. In the charge to the jury, the court also stated:

> As I said to you just a few minutes ago, neither side, directly or by insinuation, neither lawyer may say to you that I believe certain things happened, or in my opinion that certain things happened, they may not do that directly or they may not do that by insinuation. So you simply disregard the remarks of that sort.

Tr. II at 2. The court further added: "As I told you several times, what the attorneys have said in their opening and closing statements may be of help to you, but you are not obliged to follow it." Tr. II at 6.

▉ Based on what occurred at trial, the defendant now makes this motion for a new trial. However, a review of the case law indicates that there is no merit to this motion. The Second Circuit reverses claims of

prosecutorial misconduct "only upon a showing '(1) that the prosecutor's statements were improper and (2) that the remarks, taken in context of the entire trial, resulted in substantial prejudice.'" *United States v. Perez,* 144 F.3d 204, 209 (2d Cir.1998) (citing *United States v. Bautista,* 23 F.3d 726, 732 (2d Cir. 1994)). In determining whether there is substantial prejudice, the Second Circuit focuses primarily on three factors: "'the severity of the misconduct, the measures adopted to cure it, and the certainty of conviction in the absence of the misconduct.'" *Id.* (quoting *United States v. Melendez,* 57 F.3d 238, 241 (2d Cir.1995)).

Here, a review of the record indicates that there was not substantial prejudice to the defendant. Even if the prosecutor may have made a few statements to the jury wherein he interjected his own opinions regarding the credibility of witnesses, the court's numerous curative instructions adequately compensated for these statements. Overall, the prosecutor's statements did not prejudice the defendant and are not grounds for a mistrial.

Finally, while defendant cites *United States v. Modica,* 663 F.2d 1173 (2d Cir. 1981), *cert. denied,* 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982) in support of his argument that the prosecutor improperly vouched for the government's witnesses, this case is distinguishable from the case at bar and actually supports the government.

In *Modica,* the Second Circuit upheld the defendant's conviction even though it found that the prosecutor "vouched" for the credibility of the government's witnesses. *Modica,* 663 F.2d at 1186. The prosecutor had used the personal pronoun "I" at least sixty times and injected his personal views into the case. *Id.* at 1181. He also made statements not supported by the evidence and even went so far as to warn the jury that it had better not let the defendant leave the courtroom "laughing at you." *Id.* at 1180. Even with such egregious misconduct, the Second Circuit still affirmed the defendant's conviction.

Accordingly, defendant's motion for a new trial is denied.

*CONCLUSION*

Based on the foregoing, defendant's motion for judgment of acquittal is denied, defendant's motion to dismiss the second superseding indictment is denied, and defendant's motion for a new trial is denied.

So ordered.